ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| Dynamic Systems Technology, Inc. | ) ASBCA No. 63037 |
| | ) |
| Under Contract No. W15QKN-19-D-0046 | ) |
| Task Order No. W15QKN-20-F-0713 | ) |

APPEARANCE FOR THE APPELLANT: James M. White, Esq.
  Marshall & White, PLLC
  Washington, D.C.

APPEARANCES FOR THE GOVERNMENT: Scott N. Flesch, Esq.
  Army Chief Trial Attorney
  MAJ Michael R. Tregle, Jr., JA
  Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE STINSON
ON PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT

Appellant Dynamic Systems Technology, Inc. (DysTech), appeals from a contracting officer's denial of its May 25, 2021, claim in the amount of $1,134,943.47, for additional costs resulting from an approved, conformed classification by the Department of Labor (DOL) of certain wage rates applicable to appellant's task order (R4, tab 024 at 003). We have jurisdiction pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §§7101-7109. The parties submitted cross-motions for summary judgment, responses, reply and (in the case of appellant) sur-reply briefs, for consideration in deciding this appeal. For the reasons stated below, the Board denies appellant's motion for summary judgment, and grants the government's cross-motion.

SYNOPSIS

This appeal presents the issue of which party bears the risk under the Service Contract Act (SCA) when the contractor errs by failing to apply the proper labor category to a position. Specifically, whether the contractor is entitled to additional SCA costs it anticipated, but did not include, in its technical and cost proposals. The solicitation required offerors to identify any non-exempt labor categories covered by the SCA and ensure that those SCA-covered labor category employees were paid the applicable prevailing wage rates. The contractor inquired from the Army pre-award (but after the closing date for such inquiries) about the exemption status of one labor category, which, as the incumbent contractor, it had knowledge suggesting that the labor category was

non-exempt. The Army inquired from DOL and informed the contractor that DOL had determined that it would not be subject to the SCA.

The contractor submitted its bid based upon what it believed to be an incorrect DOL determination and stating its intention to submit a request for equitable adjustment once DOL granted a conformance of that labor category, which the contractor planned to submit and was certain would be granted. The burden of determining application of the SCA fell solely on the contractor. Despite its prior knowledge, and by ignoring its own beliefs as to the exemption status of the specific labor category, the contractor submitted a lower, and therefore, more advantageous, cost proposal.

<u>STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION</u>

The parties agree that the material facts in this appeal are undisputed.[1]

I. <u>DysTech's Experience With Wage Determinations On Another Contract Prior to Submitting a Proposal on the Task Order at Issue</u>

1. On September 29, 2015, the United States Army Contracting Command – New Jersey (the Army) awarded DysTech Task Order 2TO2 under Contract No. W91WAW-11-D-0030 (the Predecessor Contract), for Army Community Services Family Advocacy Program Support at Fort Bliss, Texas (R4, tab 001 at 1-2; GSUMF ¶ 1; ASUMF ¶ 3).

2. On May 7, 2018, the Army issued unilateral Modification No. 04 to Task Order 2TO2 (R4, tab 002 at 1). The purpose of the modification was "to incorporate the appropriate wage determinations into the task order" (R4, tab 002 at 2). The modification incorporated the following three wage determinations:

> 2005-2511 Revision 20 dated 07/08/15 for the Base Year
> 2015-2511 Revision 02 dated 09/01/16 for Option Year 1
> 2015-5229 Revision 03 dated 08/03/17 for Option Year 2

(R4, tab 002 at 2; ASUMF ¶ 4).

3. The labor category "Program Educator" was not included in any of the three wage determinations incorporated into Task Order 2TO2 by Modification No. 04

---

[1] The government states in its opposition to appellant's motion that it does not dispute appellant's statement of undisputed material facts (ASUMF) (gov't cross-mot. at 1). Appellant's response to the government's cross-motion for summary judgment contains no specific objections to the government's statement of undisputed material facts (GSUMF), stating instead that "there is currently no dispute of material facts amongst the parties" (app. reply. at 2).

(ASUMF ¶ 5).  On August 23, 2018, DOL approved the conformance of the "Program Educator" classification into the three wage determinations added to Task Order 2TO2 by Modification No. 04, stating:

> This is in response to your conformance request received via email on August 21, 2018, for a classification and wage rate not listed on Wage Determinations (WDs) 2005-2511 (Rev. 20), dated July 8, 2015; 2015-2511 (Rev. 1), dated February 18, 2016; and 2015-5229 (Rev. 2), dated July 25, 2017. These WDs are applicable to contract number W91 WAW11D0030 for [A]rmy community service support services in El Paso, El Paso County, Texas.

(R4, tab 003; ASUMF ¶ 5)  Wage Determination 2015-5229 (Rev. 2) set the conformed Program Educator classification hourly wage rate and fringe benefit rate at $19.87 and $4.41, respectively, with a contract period commencing September 30, 2017 (R4, tab 003; ASUMF ¶ 5).  The wage determination also included a labor classification for Technical Instructor (occupation code 15090), with the same hourly wage rate of $19.87.[2]

## II.  Award of the Contract

4.  On December 21, 2018, the Army awarded DysTech a Multiple Award Indefinite Delivery-Indefinite Quantity (IDIQ) Contract No. W15QKN-19-D-0046 (the Contract) for Army Personnel Life-Cycle Support at "Department of Defense (DOD) and other Federal Agencies" (R4, tab 026 at 1-2; ASUMF ¶ 1).

5.  The Contract incorporated by reference the following provisions of the Federal Acquisition Regulation (FAR):  FAR 52.222-41, SERVICE CONTRACT LABOR STANDARDS (MAY 2014); FAR 52.222-43, FAIR LABOR STANDARDS ACT AND SERVICE CONTRACT LABOR STANDARDS – PRICE ADJUSTMENT (MULTIPLE YEAR AND OPTION CONTRACTS) (MAY 2014); and FAR 52.222-44, FAIR LABOR STANDARDS ACT AND SERVICE CONTRACT LABOR STANDARDS – PRICE ADJUSTMENT (MAY 2014) (R4, tab 026 at 41; ASUMF ¶ 2).

## III.  The Solicitation for the Task Order at Issue and Discussions About the Applicability of the SCA

6.  On June 26, 2020, the Army issued a memo "To All Human Resource Solutions Personnel Life-Cycle Support (PLS) Contractors," with the subject,

---

[2] Although the record does not contain a copy of Wage Determination 2015-5229 (Rev. 2), a copy is located at https://sam.gov/wage-determination/2015-5229/2 (last accessed 10/19/2022).

"Solicitation W15QKN-20-R-0070 Army Community Service Army Garrison Hood Bliss," and attachments, "RFP Attachments W15QKN20R0070 ACS.ZIP" (R4, tab 011). The solicitation stated that "[t]his Request for Proposal (RFP) is issued to all Small Business Contractors under the PLS Suite . . . requesting proposals for U.S. Army Garrison Fort Hood and Fort Bliss Army Community Service (ACS) Support Services" (*id*.). The government contemplated "award of a Firm-Fixed Price (FFP) Task Order with cost reimbursement (no fee) line items for Other Direct Costs (ODCs) including Travel issued against the PLS Suite of the Human Resource Solutions (HRS) Indefinite Delivery/Indefinite Quantity (IDIQ) Contract vehicle" (*id*.; ASUMF ¶ 6; GSUMF ¶ 2).

7. Attached to the RFP was a list of "Family Advocacy Program Support COMMONLY ASKED QUESTIONS" (R4, tab 011 at 003). One of the questions concerned application of the McNamara-O'Hara Service Contract Act (SCA), 41 U.S.C. §§ 6701-6707, inquiring:

> 8. What Service Contract Act applicable Labor Categories and Wage Determinations should be used for the proposal?
>
> RESPONSE: The Government is not mandating the use of Service Contract Act applicable labor categories – proposed labor categories are determined by the Offeror. As stated in the Task Order Evaluation Plan (TOEP) "The Offeror will identify any labor categories that are non-exempt and are covered by the Service Contract Act. Labor categories covered by the SCA will be subject to the requirements of the prevailing wage determination base labor rates for the actual place(s) of performance. SCA Wage Determinations are available at https://beta.sam.gov/."

(R4, tab 011 at 003-004; ASUMF ¶ 7-8)[3]

8. The RFP also included FAR 52.222-42, STATEMENT OF EQUIVALENT RATES FOR FEDERAL HIRES (MAY 2014), which provides:

> [i]n compliance with the Service Contract Labor Standards statute and the regulations of the Secretary of Labor (29 CFR part 4), this clause identifies the classes of service employees expected to be employed under the contract and states the wages and fringe benefits payable to each if they were

---

[3] It does not appear that the record includes a copy of the TOEP, which was Attachment 0005 to the RFP.

employed by the contracting agency subject to the provisions of 5 U.S.C. 5341 or 5332

(R4, tab 011 at 005). Set forth below the FAR provision was the following:

This Statement is for Information Only: It is not a Wage Determination

| Employee Class | Monetary Wage -- Fringe Benefits | |
|---|---|---|
| Program Management Series (GS-0340-12) | $36.76 | 42.10% |
| Social Science Series (GS-0101-9) | $25.35 | 42.10% |
| Office Automation Clerical and Assistance Series (GS-0326-4) | $14.95 | 42.10% |

NOTE: The rates listed in the "Monetary Wage" column are unadjusted rates obtained from the 2020 General Schedule (GS) Rest of U.S. Pay Table.

(R4, tab 011 at 005)

9. The RFP required all questions from offerors be submitted in writing to the contract specialist, Danny Howell, via email by July 7, 2020, 10 a.m. Eastern Time, and stated that "[a]ny questions received after this time will not be addressed" (R4, tab 011 at 1). The deadline for receipt of "responses/offers" to the RFP was 10:00 a.m. Eastern Time, July 17, 2020 (R4, tab 011 at 002; ASUMF ¶ 9).

10. By email dated July 7, 2020 (and sent at 10:17 am) to Mr. Howell, Kevin Cashman, DysTech Contracts Manager (R4, tab 023 at 0017), submitted the following question regarding the RFP: "[d]oes this contract have any CBA's [collective bargaining agreements] or conformed WDs currently in place at either installation. If so, will the Government provide those to industry." (R4, tab 012)[4]

11. By email dated July 8, 2020, Mr. Howell responded to DysTech stating "[y]our question was received after the time/date specified in the RFP. Your question will not be addressed." (*Id*.)

12. The Army subsequently inquired from DOL if Program Educators, as proposed by DysTech, were subject to the SCA (R4, tab 013; GSUMF ¶ 3). By email

---

[4] Although it is undisputed that appellant submitted its question after the time deadline for such inquiries specified in the RFP (R4, tab 011 at 002), appellant's statement of undisputed material facts, paragraph 10, states, apparently incorrectly, that appellant asked this question on July 8, 2020, not July 7, 2020, citing as support R4, tab 012, and that the government responded to the inquiry that same day.

dated July 10, 2020, with the subject line "SF98 # 0106523 Request," Marjorie Hodges, DOL, advised Mr. Howell:

> Based on the information that you have provided, the services called for under this procurement appear to be performed exclusively, or nearly so, by professional employees.
>
> Bona fide professional employees are not service employees, and this procurement would not be subject to the Service Contract Act. Please see Title 29 C.F.R. Part 541 or contact the Fair Labor Standard Act office . . . for assistance.

(R4, tab 013)[5] By email also dated July 10, Mr. Howell informed Contracting Officer John Fields ), "[t]his is what DOL has said concerning the solicitation for Hood Bliss" (*id.*).

13. By email dated July 13, 2020 (2:43 p.m.), to Mr. Howell, Mr. Cashman stated:

> I wanted to follow-up on my email from last week regarding a conformed WD for this task order. Please see attached the letter from DoL to Mr. Mauriello as it relates to Fort Bliss. While I did originally ask a question with respect to this, I also wanted to alert you to something that was incorporated into our contract which will be something that the awardee will need to incorporate into the next generation. Thank you very much for your consideration.

(R4, tab 015 at 0001-02) Attached to that email was a copy of DOL's August 23, 2018, approval of the conformance request under the Predecessor Contract, Task Order 2TO2 (ASUMF ¶ 11; R4, tab 003).

14. By email dated July 13, 2020 (3:09 p.m.), to Mr. Cashman, Mr. Howell stated, "[w]e requested an updated conformed Wage Determination from the Department of Labor and they have replied back the labor categories listed on the conformed copy of the old task [order] would not be subject to the Service Contract Act" (R4, tab 015 at 0001; GSUMF ¶ 4; ASUMF ¶ 12).

---

[5] It does not appear that the record includes a copy of the referenced "SF98 # 0106523 Request," which apparently is a reference to Standard Form 98, entitled "Notice of Intention to Make a Service Contract and Response to Notice." *Tecom, Inc.*, ASBCA No. 51591, 01-1 BCA ¶ 31,156 at 153,897.

15. By email dated July 13, 2020 (4:19 p.m.), Mr. Cashman responded to Mr. Howell, stating:

> Just to follow-up on our call. I spoke with Ms. Lourdes Torres who was the auditor for DoL that worked with myself and Mr. Dennis Simms for the Fort Bliss contract. What she shared with me was that even though this is a recompetition, the conformed labor category that was created would still be applicable for this requirement, and once a contract is converted to SCA it cannot be pulled out of that requirement unless material changes were made to scope, which in this case they were not. Provided below, please see Ms. Torres' contact information. She had mentioned that someone reached out to her last week about this contract, but she was not on duty, and she was going to be following-up on it this week. If there is anything additional we can do to support, I would greatly appreciate it.

(R4, tab 015 at 0001; ASUMF ¶ 13)

IV. DysTech's Proposal

16. On July 17, 2020, DysTech submitted its technical proposal, stating that "[o]ur Program Educators and PM/Analysts will be classified as Exempt employees" (R4, tab 035 at 14; ASUMF ¶ 14).

17. The technical proposal also provided:

> **Team DysTech understands the scope of support our ACS Programs provide, and as a result, knows that proposing an alternate labor mix will result in an additional DoL audit which can take precedence over the work. As highlighted in our methodology, our labor mix aligns with DoL findings, and will ensure that the ACS comes first. Additionally, Team DysTech is the only vendor who can ensure that the Fort Bliss and Fort Hood contract will not have to be subject to another audit by Department of Labor.** While we were notified by the Contracting Office that the Program Educators at Fort Bliss are no longer subject to the SCA, we understand the risk and potential increased cost and service impact to the Government by being subject to another DoL audit. As a result, we will align our Administrative Personnel labor methodology based on the

7

DoL findings.  After award, we will consult with the
Contracting Office and DoL regarding the current conformed
wage determination (WD) for the Fort Bliss Program
Educators, and its applicability.  If all parties determine it
necessary to utilize the WD, we will submit a conformed
wage determination classification for the Program Educator
labor category for Fort Bliss, as well as Fort Hood.

(R4, tab 035 at 13 (emphasis in original); compl. ¶ 15, answer ¶ 15; ASUMF ¶ 15)

18.  On July 17, 2020, DysTech also submitted its cost or price proposal on an
Excel spreadsheet (R4, tab 036).  DysTech's "Cost/Price Assumptions" included the
following information:

10. If any changes occur to the Wage Determination,
DysTech will request an equitable adjustment from the
Government.

. . .

12. Upon award, DysTech will work with the Contracting
Office and Department of Labor to determine whether the
existing conformed Program Educator labor classification is
applicable.  If so, DysTech will create the conformed wage
determination and submit it to the Contracting Office for
review and approval.  Additionally, Team DysTech will
request an equitable adjustment for the incorporation of the
conformed wage determination.

(R4, tab 036 at Cost-Price Assumptions tab;[6] compl. ¶ 15, answer ¶ 15; ASUMF ¶ 15)

V.  The Award of the Task Order

19.  On September 22, 2020, the Army awarded DysTech Task Order
No. W15QKN20F0713 (Task Order 0713) "to provide Army Community Services (ACS)
Support Services for U.S. Army Garrison (USAG) at Fort Hood and Fort Bliss in
accordance with the Performance Work Statement (PWS)," and "in accordance with the
terms and conditions of PLS Contract Number W15QKN-19-D-0046" (R4, tab 016
at 0002-0004; ASUMF ¶ 17; GSUMF ¶ 5).  Task Order 0713 had a transition period of
performance from September 22, 2020, through September 29, 2020, and a base period of

---

[6] Here, tab refers to the identifying area at the bottom of the Excel spreadsheet.

performance from September 30, 2020, through July 30, 2021, with four successive one-year option periods thereafter (R4, tab 016 at 0003; ASUMF ¶ 16).

20. Task Order 0713 included as attachments Wage Determination No. 2015- 5229 (Rev. 11) (June 27, 2020), applicable to Fort Bliss (located in El Paso County, TX), and Wage Determination No. 2015-5237 (Rev. 13) (May 27, 2020), applicable to Fort Hood (located in Bell County, TX) (R4, tab 016 at 0027, 0030-0073; ASUMF ¶ 18). Neither wage determination included a labor classification for Program Educator, which was the subject of the conformed classification to wage determinations issued under the Predecessor Contract and Task Order 2TO2 at Fort Bliss (R4, tab 003; ASUMF ¶¶ 5, 18). Both wage determinations included a labor classification for Technical Instructor (occupation code 15090), with an hourly wage rate of $19.87 for that classification applicable to Fort Bliss, and $24.13 applicable to Fort Hood (R4, tab 016 at 0030, 0037, 0052, 0059).

VI. Discussion of the Conformance Process for Program Educators and DysTech's Submission of a Conformance Request

21. On September 24, 2020, Mr. Cashman contacted Ms. Torres from DOL via telephone "to reconfirm the conformance process" (R4, tab 023 at 0017, ASUMF ¶ 19). Mr. Cashman asked Ms. Torres "whether in her professional opinion she felt we should also create a conformed WD for the Program Educators at Fort Hood, to which [Ms. Torres] stated, 'Yes'" (R4, tab 023 at 0017).

22. The parties discussed the conformance process during a post-award meeting on September 28, 2020 (*id*.; ASUMF ¶ 19). By email to Mr. Cashman, dated September 28, 2020, Mr. Fields provided guidance for submitting a conformance request (R4, tab 023 at 0039-0040; ASUMF ¶ 20). Mr. Fields's email stated:

> If you look at the conformance copy for Program Educator, it lists 2015-5229 for the last contract period of 9/30/2017. For technical instructor 15090 on the current WD 5229 (rev 11), the technical instructor on 5229 is the same rate of $19.87 as on the conformed copy for Program Educator for 2017. It looks like it was included in future WD after 2017 but called a different name. Anyway, I'm no expert in this stuff. If you want to go the route of submitting a conformed copy, guidance is listed below.

(R4, tab 023 at 0039)

23. On October 23, 2020, DysTech submitted conformance request documentation to the Army for Program Educators at both Fort Hood and Fort Bliss (R4,

9

tab 018 at 0003-0004, 0007-0009; ASUMF ¶ 21).  Mr. Cashman signed the form on behalf of DysTech, which provided the following "rationale" for the conformance request as provided by appellant:  "The Program Educator falls under the broad occupational category of Instructional Occupations.  The duties of the Program Educator are similar to that of the Technical Instructor, and share the same FGE [Federal Grade Equivalency] (GS-7)."  (R4, tabs 018 at 0007-0008, 023 at 0071)  An hourly wage rate of $19.87 was identified for El Paso County, Texas, and an hourly wage of $24.13 was identified for Bell County, Texas (R4, tab 018 at 0007-0008).

24.  The executed SF 1444 (Request for Authorization of Additional Classification and Rate) for both Fort Bliss and Fort Hood stated, "the Contracting Officer recommends approval by the Wage and Hour Division" (R4, tab 018 at 0007-0008; ASUMF ¶ 22).

VII.  DOL Approves the Conformance Request, the Parties Act Upon it, and DysTech Seeks a Price Adjustment

25.  By letter dated October 29, 2020, DOL approved the requested conformances for Program Educators not listed on Wage Determinations 2015-5229 (Rev. 11) and 2015-5237 (Rev. 13) (R4, tab 023 at 0048; ASUMF ¶ 23).  The letter stated that the wage determinations "are applicable to contract number W15QKN-19-D-0046 to provide army community service (ACS) support services in El Paso, El Paso County and Killeen, Bell County, Texas" (R4, tab 023 at 0048; ASUMF ¶ 23).  An hourly wage rate of $19.87 was set for El Paso, Texas (2015-5229 (Rev. 11)) and an hourly wage of $24.13 was set for Bell, Texas (2015-5237 (Rev. 13)) (R4, tab 023 at 0048).  The conformance also set a fringe benefits rate of $4.54 for both areas, unless the "contract is subject to Executive Order 13706, Establishing Paid Sick Leave for Federal Contractors, the fringe benefits rate is $4.22" (R4, tab 023 at 0048; ASUMF ¶ 23).  These conformed classifications and wage rates were "retroactive to the commencement date of the contract" (R4, tab 023 at 0048; ASUMF ¶ 23).

26.  By email dated November 13, 2020, Mr. Howell provided Mr. Cashman a copy of Modification No. P00002, for review and signature (R4, tab 023 at 0049; ASUMF ¶ 25).  By email dated November 16, 2020, Mr. Cashman responded to Mr. Howell:

> With the incorporation of the conformed labor categories, we will need to submit revised pricing as our Educators were originally priced as exempt, and they are now SCA.  How would you like for us to submit our revised pricing?  When we worked on back wages previously we utilized the PACT sheet; however, it may be more advantageous if we submitted a revised pricing proposal, as this will better align the contract for the base and all option years.  It will also add these

10

positions to the SCA Breakout tab so you can see the
minimum SCA standards are being met.

(R4, tab 023 at 0049; ASUMF ¶ 25)[7]

27.  By email also dated November 16, 2020, Mr. Howell responded to
Mr. Cashman, stating, "[p]lease complete the PACT sheet . . . . We will also need salary
records of the individuals going from exempt to non-exempt to support any request for
adjustment."  (R4, tab 023 at 0049; ASUMF ¶ 26)

28.  On November 20, 2020, the parties entered bilateral Modification
No. P00002, incorporating "conformed classification of 'Program Educator' and wage
rates to existing Wage Determinations (WDs) from the initial award" (R4, tab 020).  The
modification incorporated into Task Order 0713, retroactive to the commencement date
of the Task Order (September 22, 2020), the following conformed classification and
hourly wage and fringe benefit rates:

| | | | |
|---|---|---|---|
| El Paso, TX | 2015-5229 (rev. 11) | $19.87 | $4.22 |
| Bell, TX | 2015-5237 (rev. 13) | $24.13 | $4.22 |

(*Id*. at 2)

29.  The modification also provided:

> Pursuant to FAR 52.222-43 "Fair Labor Standards Act and
> Service Contract Labor Standards-Price Adjustment (Multiple
> Year and Option Contracts),["] you are required to notify the
> Contracting Officer of any increase claimed under this clause
> within 30 days after receiving a new wage determination
> unless this notification period is extended in writing by the
> Contracting Officer.

(*Id*.)

30.  By email dated December 9, 2020, Mr. Cashman provided Mr. Howell the
requested PACT sheet and consolidated pay slips for all employees impacted by the
conformance (R4, tab 023 at 0027, 0074-0093; ASUMF ¶ 27).  Mr. Cashman also stated:

> The one anomaly that you will see is our employees located
> at Fort Bliss. With the Program Educators being SCA on the

---

[7] PACT sheet is a reference to the government's "Price Adjustment Calculation Tool," an
automated method of calculating SCA price adjustments (R4, tab 023 at 0074).

11

previous contract, we did not cause any hardship to them by paying them as exempt employees for 1 month. While our bid proposed them [sic] employees as exempt, so no H&W was bid, we decided to continue paying the H&W knowing that the position would be conformed at the start of the contract. While our PACT sheet shows that those employees have received the full H&W cost, you will see in our cost volume it was not bid, so we are requesting the full H&W cost for each employee located at Fort Bliss. I hope that makes sense.

(R4, tab 023 at 0027)[8] For Program Educators employed at Fort Bliss, the PACT sheet indicated an actual hourly wage paid of $19.87 (five employees), and $20.87 (one employee) (R4, tab 023 at 77). For Program Educators employed at Fort Hood, the Pact sheet indicated an actual hourly wage rate paid of $20.19 (two employees), $20.47 (six employees), $21.63 (three employees) and $25.13 (one employee) (*id.*). The PACT sheet listed a new required minimum wage of $19.87 for Fort Bliss, and $24.13 for Fort Hood (*id.*).

31. During December 2020, through January 8, 2021, the parties exchanged additional information in support of DysTech's request for a price adjustment based upon DOL's conformed classification of the Program Educators position (R4, tab 023 at 0022-0027; ASUMF ¶ 28).

VIII. The Government Informs DysTech That it is not Entitled to a Contract Adjustment; DysTech Disagrees; a Claim Follows

32. By email dated March 4, 2021, Mr. Fields informed Mr. Cashman that:

After further research, you are not entitled to an adjustment under FAR 52.222-43 "Fair Labor Standards Act and Service Contract Labor Standards-Price Adjustment (Multiple Year and Option Contracts)" for conformed classification of Program Educators incorporated into Modification P00002.

Additional wages and/or fringe benefits required by U.S. Department of Labor's response to a conformance request are not adjustable under the FAR 52.222-43 clause for any contract period. However, conformance establishes a base line for incremental wage and/or fringe benefits increases

---

[8] H&W is a reference to health and welfare fringe benefits paid to employees pursuant to the SCA. 29 CFR § 4.175.

(or decreases) in subsequent contract periods.

When the next Wage Determination update (FAR 22.1007) occurs, such as the option exercise, the FAR 52.222-43 price adjustment - for the delta between the rates paid during one Period of Performance and the rates required in the next Period of Performance (via indexing) – would occur. Changes to the contract's initial price is not covered by the FAR 52.222-43 clause and that price adjustment clause does not consider the wage rate that the contractor paid under a different contract.

(R4, tab 022 at 0005; ASUMF ¶ 29)

33. By email dated March 8, 2021, Mr. Cashman responded to Mr. Fields, stating:

It is my understanding that FAR 52.222-43 would be applicable if the conformed labor category was provided during the bid process, which this was not. From reading case laws where other vendors experienced similar situations, the courts ruled that the incorporation of the conformance would have resulted in a change, thus FAR 52.243-1, Alt II (a)(1) and (b) would be applicable. I would agree that FAR 52.222-43 will be applicable during the option years, so long that the contract was amended to incorporate the differences in H&W and labor rate for the base year and all option years. As we indicated once the modification was issued, the Government was making a material change to the contract converting our positions from exempt to SCA, and that this change would result in a price adjustment to our overall bid. Based on FAR 52.243-1, I believe that we have satisfied all requirements necessary for you to accept the proposed equitable adjustments.

(R4, tab 022 at 0004)

34. By email dated April 2, 2021, Mr. Fields responded to Mr. Cashman's March 8, 2021, email, stating that he did not agree the situation described by Mr. Cashman was a constructive change to Task Order 0713 pursuant to FAR 52.243-1, CHANGES-FIXED-PRICE (AUG 1987) (R4, tabs 022 at 001, 026 at 42). Mr. Fields also stated:

13

On 18 Feb 2021, I spoke with Ms. Stone from the Department of Labor about this matter. She told me that just because the Contractor proposed the Program Educators as SCA exempt, they are not truly exempt if the tasks/duties are similar to ones listed in the Wage Determination. They still have the responsibility to pay the prevailing wage and fringe rates and to not do so, would be a violation of the Service Contract Act.

She told me that a Contractor is not entitled to an adjustment in the base period of a contract since they already have the responsibility to pay the prevailing rates. They may be entitled to an adjustment in subsequent periods in the event the prevailing rate increases.

Based on the information above, you are not entitled to an adjustment in this Task Order for the base period under either the changes clause or FAR 52.222-43. You may be entitled to an adjustment per the FAR 52.222-43 clause in subsequent option periods if there is a revision to the Wage Determinations resulting in an increase to the wage and/or fringe rates.

(R4, tab 022 at 0002)

35. By letter dated May 25, 2021, DysTech submitted a claim to the Army seeking relief based upon FAR 52.222-41, SERVICE CONTRACT LABOR STANDARDS (MAY 2014), FAR 52.222-43, FAIR LABOR STANDARDS AND SERVICE CONTRACT LABOR STANDARDS-PRICE ADJUSTMENT (MULTIPLE YEAR AND OPTION CONTRACTS) (MAY 2014), and FAR 52.222-44, FAIR LABOR STANDARDS ACT AND SERVICE CONTRACT LABOR STANDARDS-PRICE ADJUSTMENT (MAY 2014), as well as the doctrine of equitable estoppel (R4, tab 023 at 0003, 0009, 0011-13). As part of its "Legal Grounds for Claim and Relief," appellant did not assert claims alleging mutual mistake or misrepresentation (R4, tab 023 at 0011-0015). Appellant's claim stated, in part:

Given that the Army failed to take any corrective action prior to the Solicitation close date (including any further Solicitation amendments), DysTech was forced to conform its proposal (including wage rates) with the existing Solicitation documents and the Army's direction that the Program Educator classification/conformance at issue was exempt from the SCA. It simply had no choice. Nevertheless, considering the inconsistent guidance provided to DysTech

14

from different parts of the United States Government (i.e. between the Army and DoL), DysTech did include express language in its proposal surrounding the matter. On page 13 of its Technical Proposal DysTech stated that: [quoting statement contained in ASUMF ¶ 15; SOF ¶ 17].

(R4, tab 023 at 0005-0006) Appellant requested $191,954.67, plus interest, for the "cumulative costs incurred by DysTech in paying its personnel the prevailing wages and fringe benefits under the applicable USDOL WD conformances," and "an upward adjustment for each Option Period term in the amount of $235,747.20 to reflect the correct WD conformances" (R4, tab 023 at 0015).

36. By letter dated August 24, 2021, the contracting officer issued a final decision denying DysTech's claim (R4, tab 024). The contracting officer stated, in part:

> In [DysTech's] cost price proposal in response to the RFP, [DysTech] proposed one SCA labor category from WD 2015-5237 and four SCA labor categories from 2015-5229. [DysTech] did not propose the Technical Instructors as other offerors did, or propose the rates at or above the rates of technical instructors since [DysTech has] requested an equitable adjustment. As previously stated, it was up to the Offeror to determine the Labor Categories. Despite the prior knowledge of the existing WDs applicability and the fact (based on DysTech's rationale on the SF 1444s) that the Technical Instructor Labor Category was similar to the Program Educators duties, DysTech made a business decision to propose Exempt personnel instead of SCA and presumably at rates lower than the Technical Instructors. All the information needed to make an informed decision was available to DysTech.

(R4, tab 024 at 008)

37. Appellant filed a notice of appeal on September 24, 2021.

DECISION

I. Standard of Review

"Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *First Commerce Corp. v. United States*, 335 F.3d 1373, 1379 (Fed. Cir. 2003). "The moving party bears

15

the burden of establishing the absence of any genuine issue of material fact and all significant doubt over factual issues must be resolved in favor of the party opposing summary judgment." *Mingus Constructors v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987). A party challenging a motion for summary judgment "'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting *First Nat'l Bank or Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)). It does not matter that the parties have cross-moved for summary judgment, both claiming that there exists no material issue of fact. *Osborne Constr. Co.*, ASBCA No. 55030, 09-1 BCA ¶ 34,083 at 168,513 ("Each cross-motion is evaluated separately on its merits, and all reasonable inferences are drawn in favor of the defending party; the Board is not bound to 'grant judgment as a matter of law for one side or the other'" (quoting *Mingus Constructors*, 812 F.2d at 1391)).

## II. The SCA and the Conformance Process

The SCA provides "wage and other protections to service employees working under U.S. government contracts," including the requirement that such employees "be paid at least as much as the 'prevailing' wage and fringe benefits paid to employees providing similar services in similar work in the same locality." *Ocean Ships, Inc. v. United States*, 115 Fed. Cl. 577, 581 (2014) (citation omitted). Pursuant to the SCA, the Secretary of Labor issues "special minimum wage orders, called 'wage determinations,' for each class of service worker employed in a particular locality, and [ ] forbids contractors (that is, employers) from paying less than the Secretary's wage determinations." *Lear Siegler Servs., Inc. v. Rumsfeld*, 457 F.3d 1262, 1266 (Fed. Cir. 2006) (citing 41 U.S.C. § 351(a)(1)).

Wage determinations are "applicable to fixed-price services contracts[,] and through a series of contract clauses, contractors are forbidden from paying less than the wages and fringe benefits contained in a wage determination." *Alutiiq Commercial Enters.*, ASBCA No. 61503, 20-1 BCA ¶ 37,506 at 182,199 (citation omitted). "The government in essence pays a premium for services in return for its contractors' compliance with these requirements." *Parsons Gov't Servs., Inc.*, ASBCA No. 61630, 20-1 BCA ¶ 37,655 at 182,816 (citing *Call Henry, Inc. v. United States*, 855 F.3d 1348, 1351 (Fed. Cir. 2017)).

The SCA also "prevents contractors from underbidding each other (and hence being awarded government contracts) by cutting wages or fringe benefits to its service workers." *Lear Siegler*, 457 F.3d at 1266. As noted by the Federal Circuit:

> Since labor costs are the predominant factor in most service contracts, the odds on making a successful low bid for a contract are heavily stacked in favor of the contractor paying the lowest wages. Contractors who wish to maintain an

16

enlightened wage policy may find it almost impossible to compete for Government service contracts with those who pay wages to their employees at or below the subsistence level. When a Government contract is awarded to a service contractor with low wage standards, the Government is in effect subsidizing subminimum wages.

(*Id.*) (quoting *Fort Hood Barbers Ass'n v. Herman*, 137 F.3d 302, 309 (5th Cir. 1998) (further citations omitted). DOL has the duty and the authority to clarify Labor employee classifications. *Collins Int'l Serv. Co. v. United States*, 744 F.2d 812, 815 (Fed. Cir. 1984). The contracting officer has "neither the duty to clarify inaccuracies nor the authority to do so. Such is the work of [DOL] as is set out in the [SCA]." *Sterling Servs., Inc.*, ASBCA No. 40475, 91-2 BCA ¶ 23,714 at 118,699.

The RFP here specified that the government was not mandating the use of SCA-applicable labor categories and, instead, that "proposed labor categories are determined by the Offeror" (SOF ¶ 7). The RFP required offerors to "identify any labor categories that are non-exempt and are covered by the [SCA]," and that "[l]abor categories covered by the SCA will be subject to the requirements of the prevailing wage determination base labor rates for the actual place(s) of performance" (*id.*).

FAR 52.222-41(c)(2)(i) provides that, where a wage determination is included with a contract,

the Contractor shall classify any class of service employee which is not listed therein and which is to be employed under the contract (i.e., the work to be performed is not performed by any classification listed in the wage determination) so as to provide a reasonable relationship (i.e., appropriate level of skill comparison) between such unlisted classifications and the classifications listed in the wage determination.

The regulation likewise provides that the "conformed class of employees shall be paid the monetary wages and furnished the fringe benefits as are determined pursuant to the procedures in this paragraph (c)." *Id*.

"The 'conformance process is a method in which contractors may propose job titles and wage rates to legally employ workers in occupations not listed in the wage determination (WD) applicable to the contract'". *Patriot Group Int'l, Inc.*, ASBCA No. 60950, 19-1 BCA ¶ 37,399 at 181,805 n.1 (citation omitted). The proposed wage rates "should provide a reasonable relationship (i.e., appropriate level of skill comparison) between such unlisted classifications and the classifications listed in the wage determination." FAR 52.222-41(c)(2)(i). FAR 52.222-41(c)(2)(ii) requires the

conforming procedure be "initiated by the contractor prior to the performance of contract work by the unlisted class of employee" and that the contractor submit a Standard Form (SF) 1444, Request For Authorization of Additional Classification and Rate, to the Contracting Officer "no later than 30 days after the unlisted class of employee performs any contract work."[9]  The contracting officer then reviews the proposed classification and rate and submits the SF 1444 to DOL, Wage and Hour Division, who "will approve, modify, or disapprove the action or render a final determination in the event of disagreement . . . ." *Id*.

## III.  Contentions of the Parties

The parties agree that the material facts in this appeal are undisputed and that summary judgment is appropriate.  Appellant argues that the undisputed facts establish DysTech is entitled to an equitable adjustment pursuant to the provisions of FAR 22.1015 and FAR 52.222-43, which supposedly provide for an adjustment when "necessitated by the Army's errors surrounding the incorporation of the appropriate wage determination" (app. mot. at 1).[10]  In the alternative, appellant argues that, assuming it is not entitled to an equitable adjustment based upon the cited FAR provisions, "the undisputed facts establish it is entitled to recovery under the following common law theories: (i) equitable estoppel; (ii) mutual mistake; and (iii) misrepresentation" (app. mot. at 1-2).[11]  Appellant's  common law theories rely primarily upon the Army's statements made in response to DysTech's inquiries seeking clarification whether the position of Program Educators was subject to the SCA (app. mot. at 12, 14; app. reply at 23).

The government argues that appellant has failed to establish the cited "FAR provisions require the government to provide an equitable adjustment under these

---

[9] The FAR provision does not specify what the contractor must do to initiate the conformance prior to the submission of the SF 1444.

[10] Appellant filed a two-page motion for summary judgment, along with additional pleadings in support.  "App. mot." refers to Appellant's Memorandum of Law in Support of Summary Judgment.

[11] Appellant's August 24, 2021, claim sought relief based only upon the FAR clauses cited and the doctrine of equitable estoppel (SOF ¶ 35).  In contrast, appellant's complaint contains five counts:  violation of law (count I); contract breach (count II); equitable estoppel/detrimental reliance (count III); mutual mistake (count IV); and good faith and fair dealings (count V) (Compl. at 10, 13, 15, 17-18).  Appellant's motion for summary judgment does not mention Count II (breach of contract) or Count V (good faith/fair dealings).  Because appellant did not file a motion for partial summary judgment, or otherwise reserve its right to assert such arguments, we assume that appellant has waived these additional arguments.  We note also that the government does not challenge our jurisdiction to consider appellant's additional legal theories not explicitly raised in appellant's claim.

18

circumstances" because, in fact, FAR 22.1015 only provides for a price adjustment when the government has represented that the entire procurement was not subject to the SCA and the price adjustments afforded by FAR 52.222-43 are only applicable to changes in costs to the extent the increase is made to comply with a wage determination applicable at the beginning of the renewal option period and neither circumstance applies here (gov't cross-mot. at 4, 9, 15 n.4). The government likewise argues that appellant has failed to establish entitlement based upon equitable estoppel, mutual mistake, or misrepresentation based upon statements made by the Army (gov't cross-mot. at 16-17, 21, 25).

IV. Appellant Has Failed to Establish Entitlement to Summary Judgment Based Upon Application of FAR 22.1015

Appellant seeks reimbursement of its increased labor costs alleging that "[t]he undisputed facts establish that DysTech is entitled to its requested remedy pursuant to [FAR 22.1015]" (app. mot. at 1). That provision, "authorizes DOL to correct errors it has discovered relating to a contracting officer's failure to include an appropriate wage determination . . . ." *Tecom, Inc.*, 01-1 BCA ¶ 31,156 at 153,901. Specifically, FAR 22.1015, DISCOVERY OF ERRORS BY THE DEPARTMENT OF LABOR provides:

> If the Department of Labor discovers and determines, whether before or after a contract award, that a contracting officer made an erroneous determination that the Service Contract Labor Standards statute did not apply to a particular acquisition or failed to include an appropriate wage determination in a covered contract, the contracting officer, within 30 days of notification by the Department of Labor, shall include in the contract the clause at 52.222-41 and any applicable wage determination issued by the Administrator. If the contract is subject to 41 U.S.C. 6707(f), the Administrator may require retroactive application of that wage determination. The contracting officer shall equitably adjust the contract price to reflect any changed cost of performance resulting from incorporating a wage determination or revision.

A. DysTech's Interpretation of FAR 22.1015 Conflicts with the Regulation's Plain Meaning

Appellant argues that FAR 22.1015 requires the government to equitably adjust the contract price because DOL allegedly "discovered and determined after Contract award that the Army 'made an erroneous determination that the [SCA] did not apply'

19

and/or 'failed to include an appropriate wage determination' in the Contract" (app. mot. at 3). As support, appellant alleges "it is undisputed that, after contract award, DoL found the Army 'made an erroneous determination that the [SCA] did not apply' to the Program Educator position" (*id.*). Appellant provides no record citation in support for its allegation that DOL made such a determination as it concerns the contracting officer's actions, and, indeed, there is none. Appellant seems to admit as much, stating that it "recognizes that FAR 22.1015 requires an equitable adjustment when DoL discovers the contracting activity made an erroneous determination that the SCA did not apply to 'a particular acquisition . . . .'" (app. mot. at 3 n.3). Yet DysTech still maintains that "here, the Army made an erroneous determination that the SCA did not apply to a particular labor category" (*id.*).

The government responds, noting that FAR 22.1015:

> provides for equitable adjustment of a contract to reflect a change in the cost of performance based on the incorporation of a wage determination (WD) or revision that results from an erroneous determination *by the contracting officer* that the Service Contract Labor Standards statute (SCA) does not apply *to a particular acquisition* or a failure to include an appropriate wage determination in a covered contract.

(gov't cross-mot. at 4 (emphasis in original)). Appellant offers no proof that the contracting officer here made an erroneous determination that the SCA did not apply to this acquisition. Indeed, the contracting officer determined just the opposite, as indicated through issuance of the RFP, that the SCA did apply (SOF ¶¶ 7-8). The government properly notes that the Army here, through issuance of the RFP, "did not seek to acquire Program Educators," rather the "acquisition in this appeal concerns, and the services the government seeks to acquire are, 'Army Community Services (ACS) Support Services for U.S. Army Garrison at Fort hood [sic] and Fort Bliss'" (gov't reply at 3 (citing ASUMF ¶ 6)). Indeed, the RFP placed upon *offerors* the obligation to propose labor categories and identify any labor categories that are non-exempt and are covered by the SCA (SOF ¶ 7), and made no mention of specific, individual labor categories.

In support of its argument, appellant suggests that the distinction between "acquisition" and "contract" is somehow significant in the context of FAR 22.1015, stating that, "[t]he term 'acquisition' does not mean the entire 'contract'" (app. reply at 3). According to appellant, "[a]n 'acquisition' is the action of the Government to acquire, retain, lease, etc. goods and services," while "[a] 'contract' is the vehicle under which such acquiring activities occur" (app. reply at 4). Appellant then argues, without any supporting citation, that "[t]he definition of 'acquisition' is broad, indicating an acquisition could mean a single acquiring act, the cumulative acquisitions under the entire contract, or the entire acquisition 'cycle.' It is deliberately broad." (*Id.*)

20

The government responds, noting that "the definition of acquisition expressly includes the contract, establishing that the acquisition of goods and services is done 'by contract'" (gov't reply at 2 (citing app. reply at 3; FAR 2.101, DEFINITIONS)). As noted by the government, "a plain reading of FAR 22.1015 suggests that whether or not the SCA applies to a particular acquisition refers to the entire acquisition process," and "contemplates a contracting officer's failure to determine that the acquisition will result in an SCA covered contract, or some other misapplication of the SCA" (*id*. at 3).

"We construe a regulation in the same manner as we construe a statute, by ascertaining its plain meaning." *Tesoro Haw. Corp. v. United States*, 405 F.3d 1339, 1346 (Fed. Cir. 2005). In so doing, we "consider the terms in accordance with their common meaning." *Lockheed Corp. v. Widnall*, 113 F.3d 1225, 1227 (Fed. Cir. 1997). "When there is no ambiguity in the meaning of the regulation, 'it is the duty of the courts to enforce it according to its obvious terms and not to insert words and phrases so as to incorporate therein a new and distinct provision.'" *Tesoro*, 405 F.3d at 1347. The meaning of FAR 22.1015 is plain, applying to a discovery and determination by DOL that a contracting officer made an erroneous determination regarding application of the SCA to particular acquisition or failed to include an appropriate wage determination. Notwithstanding appellant's contrary assertion, the contracting officer did not make an erroneous determination, rather, the information conveyed by the Army to DysTech was DOL's response to the Army's pre-award inquiry (SOF ¶¶ 12, 14). Specifically, Ms. Hodges of DOL, advised Mr. Howell, the Army contract specialist, in response to an SF98 request, that "the services called for under this procurement appear to be performed exclusively, or nearly so, by professional employees," and that "[b]ona fide professional employees are not service employees, and this procurement would not be subject to the Service Contract Act" (SOF ¶ 12). Mr. Howell informed the contracting officer of DOL's response, and subsequently told Mr. Cashman, "[w]e requested an updated conformed Wage Determination from the Department of Labor and they have replied back the labor categories listed on the conformed copy of the old task [order] would not be subject to the Service Contract Act" (SOF ¶¶ 12, 14).

We agree with the government that the record here reflects no such error made by the contracting officer, nor did DOL make a determination that the contracting officer made any such error contemplated in FAR 22.1015 (*id*.). We reject DysTech's attempt to "insert words and phrases" into FAR 22.1015, "so as to incorporate therein a new and distinct provision." 405 F.3d at 1347. Appellant's suggestion that the contracting officer made an erroneous determination, thereby entitling DysTech to relief based upon application of FAR 22.1015, is simply incorrect.

Appellant also argues that FAR 22.1015 does not include the term "entire acquisition," rather, "the drafters use the following language: 'the Service Contract Labor Standards statute did not apply to a <u>particular acquisition,</u>'" and that "[a] plain reading of

21

the text indicates that a single (or 'particular') acquisition – i.e. of a specific good or a specific service type – is supported by the text" (app. reply at 4) (emphasis in original). Again, DysTech provides no legal support for its interpretation of the term "particular acquisition."

The government responds, stating that "[f]inding the 'particular acquisition' within the meaning of FAR 22.1015 to include every single act in the acquisition process would produce absurd results" (gov't reply at 3). We agree. Taken to its logical extreme, under DysTech's reading, a "particular acquisition" could apply, for example, to the acquisition of every nut, bolt, or widget that makes up a weapons system procurement. As noted by the Federal Circuit in *Kelly v. United States*, 826 F.2d 1049, 1052-53 (Fed. Cir. 1987), "[s]tatutes and regulations must be construed to avoid absurd and whimsical results . . . ." *See also Aero Mayflower Transit Co. v. United States*, 162 Ct. Cl. 233, 237 (1963) (rejecting government's "twisted," "strained construction," of a tariff provision). Although appellant suggests that the government's argument "strains credulity, even under the friendliest reading of the law" (app. reply at 3), we find that it is appellant's argument, fabricated out of whole cloth, that "strains credulity."

B. Appellant's Reliance Upon *Ralph Construction* and *Schleicher* is Misplaced

Appellant cites *Ralph Constr., Inc.*, ASBCA No. 35633, 88-2 BCA ¶ 20,731 at 104,757, for the position that the Board will grant relief to a contractor for correction of a "single position" within a contract, where the "[t]he record is clear that the wage determination in this case was incomplete to the extent that it did not contain a classification and wage for a 'Trouble Desk Operator/Clerk-Dispatcher'" (app. reply at 6). Appellant's reliance upon our decision in *Ralph Construction* is misplaced. In that appeal the incumbent contractor (who ultimately was not the successful awardee) raised with the contracting officer an ambiguity in the solicitation regarding "the omission of a classification and wage rate for a trouble call desk clerk or 'Dispatcher/Clerk' in the attached wage determination." *Ralph Constr.*, 88-2 BCA ¶ 20,731 at 104,758. Noting that "[n]o other bidder was in a position to know that the 'Trouble Desk Operator/Clerk-Dispatcher' identified in the SERVICE CONTRACT ACT clause was covered by the wage determination," we held that "the burden of clarification shifted to the contracting agency to ensure that all bidders bid on the same basis concerning the applicable wage rate." *Id.*

Because the contracting agency had failed to meet its duty to inform other bidders that the wage rate for "Trouble Desk Operator/Clerk-Dispatcher" specified in the solicitation was not an accurate basis upon which to compute their labor costs, we found that the contractor was entitled to an equitable adjustment for the resulting increased labor costs for that position. *Id.* at 104,759-60. As noted by appellant in its initial brief, *Ralph Construction* stands for the proposition that "a contractor may have a superior knowledge claim when a contracting agency knew that a wage rate in a solicitation was

22

not accurate" (app. mot. at 9). In this appeal, DysTech cannot successfully argue that the government had superior knowledge as to the position of Program Educator, as it was DysTech, as the incumbent contractor, who argued that the position should be included in the SCA wage determination. DysTech, like the incumbent in *Ralph Construction*, knew of the prior conformance of Program Educators and, as such, DysTech cannot properly rely upon our decision in that appeal to support its proposition that it is entitled to an equitable adjustment here because the government failed to disclose such information to DysTech.

In its sur-reply brief, appellant also argues that *Ralph Construction* supports its interpretation of the term "particular acquisition" as set forth in FAR 22.1015, stating that, "in the context of wage determinations, it makes sense to apply the term 'particular' to individual acquiring actions . . . because the SCA is applied on a position-by-position basis" (app. sur-reply at 2). This argument ignores the fact that, in *Ralph Construction*, we held that the wage determination at issue was incomplete to the extent that it did not contain a classification and prevailing minimum hourly wage rate for a specific labor category. *Ralph Constr.*, 88-2 BCA ¶ 20,731 at 104,757. In this procurement, however, the Army did not mandate the use of SCA labor categories, rather, the offeror was responsible for identifying labor categories that are non-exempt and covered by the SCA (SOF ¶ 7). Our decision in *Ralph Construction* did not address the meaning of "particular acquisition" as it is used in FAR 22.1015, nor was that an issue even discussed as a basis for our decision. We reject appellant's attempt to equate the term "particular acquisition" with "particular labor category."

Appellant cites the Federal Circuit's unpublished decision in *Schleicher Cmty. Corr. Ctr., Inc. v. Gonzales*, 212 Fed. Appx. 972 (Fed. Cir. 2007), for the proposition that the court of appeals "recognizes that FAR 22.1015 authorizes a contracting officer to equitably adjust a contract for 'any changed costs resulting from Government error'" (app. mot. at 3 n.3). In that decision, the Federal Circuit affirmed the denial of a contractor's claim to receive interest on amounts allegedly due the contractor for additional wages paid after the incorporation of an SCA wage determination into its contract. *Schleicher*, 212 Fed. Appx. at 976. In its responsive brief, the government properly recognizes an important factual distinction between *Schleicher* and this appeal, stating that "*Schleicher* relied on FAR 22.1015 to permit limitation of profit reimbursement for increased costs due to the belated incorporation of a wage determination into the contract for the first time," and that in this appeal, "the wage determinations were properly incorporated into the contract at award" (gov't cross-mot. at 6). Accordingly, the Federal Circuit's statement that a "contracting officer may . . . 'equitably adjust' the contract price 'retroactively' due to any changed cost resulting from Governmental error, such as belated incorporation of a wage determination, pursuant to 48 C.F.R. § 22.1015," is dicta and has no application to this appeal where there was no "belated incorporation of a wage determination." *Schleicher*, 212 Fed. Appx. at 976.

C.  DysTech's Pre-Award Inquiry and Prior Understanding of the Program
Educator Conformance Position

We note that Mr. Cashman's initial inquiry to Mr. Howell, submitted *after* the
closing time specified in the RFP for such inquiries, asked whether there were any
"conformed WDs currently in place at either installation.  If so, will the Government
provide those to industry."  (SOF ¶ 10)  This question seems somewhat disingenuous
given that appellant already knew, at least regarding the Predecessor Contract and Task
Order 2TO2, that at Fort Bliss DOL had conformed the position of Program Educator
into the wage determinations applicable to DysTech, which was providing services there.
Indeed, with DysTech's knowledge of DOL's previous conformance of the Program
Educator position at Fort Bliss, DysTech knew more than it let on with the general
question it asked, i.e., whether there were any confirmed wage determinations in place
at either installation.  Several days later, Mr. Cashman followed up with Mr. Howell by
transmitting a copy of the conformance issued on the previous Task Order 2TO2, stating
"[w]hile I did originally ask a question with respect to this, I also wanted to alert you to
something that was incorporated into our contract which will be something that the
awardee will need to incorporate into the next generation" (SOF ¶ 13).  In so doing,
Mr. Cashman answered his own question.

It is undisputed that after the contracting officer conveyed to appellant information
it received from DOL, which appellant believed to be incorrect, appellant continued to
express its belief that the position of Program Educators should not be classified as
exempt (SOF ¶¶ 13-16).  DysTech stated in its technical and cost proposals that its
"Program Educators and PM/Analysts will be classified as Exempt employees" but that,
after award, DysTech would "submit a conformed wage determination classification for
the Program Educator labor category for Fort Bliss, as well as Fort Hood" (SOF ¶¶ 16-
18).  It also is undisputed that appellant believed DOL would issue a conformance
(initiated by appellant), and classify Program Educators as subject to the SCA, stating,
"[w]hile our bid proposed them [sic] employees as exempt, so no H&W was bid, we
decided to continue paying the H&W *knowing* that the position would be conformed
at the start of the contract [Task Order 0713]") (SOF ¶ 30) (emphasis added).

The RFP Task Order Evaluation Plan specified that, although the government did
not mandate use of SCA-applicable labor categories, offerors were required to propose
and "identify any labor categories that are non-exempt and are covered by the Service
Contract Act," and that any such categories identified by an offeror "will be subject to the
requirements of the prevailing wage determination base labor rates for the actual place(s)
of performance" (SOF ¶ 7).  Accordingly, the RFP placed upon offerors the obligation to
identify which of its proposed labor categories were subject to the SCA.  To the extent
DysTech identified Program Educators as being an SCA non-exempt labor category, the
RFP, and resulting Task Order 0713, subjected that labor category to payment of the SCA
prevailing wage labor rate and required Dystech to propose such rates accordingly (*id*.).

24

D.  The Import of the Technical Instructor Position and It's Hourly Wage Rate

Wage Determination 2015-5229 (Rev. 2), applicable to Task Order 2TO2, included the same hourly rate for Technical Instructor ($19.87) as the conformed wage determination for Program Educators (SOF ¶¶ 2-3).  DysTech admitted in its conformance request that "Program Educator falls under the broad occupational category of Instructional Occupations," and "[t]he duties of the Program Educator are similar to that of the Technical Instructor, and share the same FGE  (GS-7)"  (SOF ¶ 23).  In its reply brief, the government argues "appellant knew that the Program Educators were analogous to the Technical Instructors because it had received a conformance for Program Educators at the Technical Instructor rate in the predecessor Contract and explicitly referenced the duties of the Technical Instructors in its request for conformance of the Program Educators" (gov't reply at 4-5) (citing ASUMF ¶ 21; R4, tab 018 at 7-8 ("The duties of the Program Educator are similar to that of the Technical Instructor, and share the same FGE (GS-7)")) (SOF ¶ 23).

The record reflects that, for DysTech's Program Educators employed at Fort Bliss, DysTech priced its RFP cost proposal so those educators would receive the conformed-hourly rate paid under the Predecessor Contract, Task Order 2TO2 - $19.87, consistent with Wage Determination No. 2015-5229 (Rev. 11), as applicable to Task Order 0713, for the position Technical Instructor (SOF ¶¶ 3, 20, 25, 30).[12]  However, DysTech did not do the same for Program Educators at Fort Hood, and did not utilize the comparable Technical Instructor hourly wage rate of $24.13 for Program Educators at Fort Hood even though appellant stated that the position of Program Educators should not be classified as exempt and expected the position would be conformed at the start of Task Order 0713 (SOF ¶ 30).[13]

Instead, for Program Educators at Fort Hood, appellant offered a variety of wage rates below the $24.13 hourly rate set forth in Wage Determination No. 2015-5237 (Rev. 13) applicable to the position of Technical Instructor at that installation (SOF ¶ 30).[14]  DysTech's approach resulted in appellant submitting a lower cost proposal that

---

[12] DysTech identified one Program Educator employed at Fort Bliss with a slightly higher hourly wage rate of $20.87 (SOF ¶ 30).

[13] There is no question that such wage rate information was available to DysTech, as the RFP informed offerors that SCA Wage Determinations, such as Wage Determination No. 2015-5229 (Rev. 11) and Wage Determination No. 2015-5237 (Rev. 13), were available for offerors to review at https://beta.sam.gov/ (SOF ¶ 7), and appellant does not allege otherwise.

[14] Although not a basis for our decision here, we note that the contracting officer's final decision states that "[DysTech] did not propose the Technical Instructors as other offerors did . . . ."  (SOF ¶ 36).

25

included a wage rate for Program Educators at Fort Hood less than the wage determination rate specified for Technical Instructors at that Fort (SOF ¶¶ 28, 30), with appellant taking the position that it would seek a price increase post-award (SOF ¶ 18). Appellant was on notice that the Program Educator position was analogous to Technical Instructor, but still proposed a lower rate for Program Educators for Ft. Hood than the rate specified for Technical Instructors in the applicable wage determination.

DysTech's claim alleged that it had "no choice" and was "forced to conform its proposal (including wage rates) with the existing Solicitation documents and the Army's direction that the Program Educator classification/conformance at issue was exempt from the SCA" (SOF ¶ 35). We disagree. FAR 52.222-41 squarely placed upon DysTech the requirement to:

> classify any class of service employee which is not listed [in the applicable wage determination] and which is to be employed under the contract . . . so as to provide a reasonable relationship (i.e., appropriate level of skill comparison) between such unlisted classifications and the classifications listed in the wage determination.

DysTech labels as not "remotely fair" the contracting officer's alleged failure to seek further clarification from DOL (app. mot. at 17). We note that the Federal Circuit in *Collins* addressed a similar argument, stating

> the contractor is placed in an equally difficult spot of having to second-guess bureaucratic minds when it cannot obtain a prompt, pre-bid clarification of Labor's classifications. If the contractor guesses low and the employees successfully contest its classification, it will foot the bill, as CISCO has. If it guesses high while a competitor guesses low, it will lose the contract. In short, application of this peculiar statutory scheme results in the business person bearing the burden of the Government's, and in particular Labor's, imprecision. This is a legislative problem which Congress, not the courts, must address.

744 F.2d at 815.[15]

---

[15] Although appellant cites *Collins* in its opening brief as support of the proposition "that if the Navy had taken an incorrect position on labor classifications, it could be estopped from denying a contractor additional compensation" (app. mot. at 9), in its reply brief, appellant seeks to distinguish the facts in that decision, suggesting that the court's decision has a "negative history" (app. reply at 6) (citing our

Applying the teaching of *Collins* to the facts of this appeal, we note, again, that appellant included in its cost proposal for Program Educators at Fort Hood a lower wage rate than the rate for Technical Instructor, which appellant admits was a similar position, thereby enhancing its chance of winning award of the Task Order (SOF ¶ 30). This approach allowed appellant to submit a lower cost proposal on this fixed price Task Order, "knowing that the position would be conformed at the start of the contract" (*id*.). Given its statements pre-award, appellant was aware that, in the event it was awarded Task Order 0713, it could cost more to perform than the amount set forth in its cost proposal once the position of Program Educator was conformed. Appellant is not entitled to the relief requested; it must "foot the bill" and "bear[] the burden of the Government's, and in particular Labor's, imprecision," as it remains "a legislative problem," which Congress, not this tribunal, must address. *Collins*, 744 F.2d at 815.

In its sur-reply, appellant labels as "irrelevant" the fact that the Program Educator position was analogous to the position of Technical Instructor "under an earlier contract" where "the Contracting Officer clarifies that it is, nevertheless, not subject to the SCA" (app. sur-reply at 3). We reject appellant's attempt to view these facts in a vacuum to explain away their relevance. Indeed, appellant's position directly contradicts another argument offered by appellant, which relied upon the conformance of the Program Educator position "under an earlier contract" as the basis for DysTech's statement that "[w]ith the Program Educators being SCA *on the previous contract*, we did not cause any hardship to them by paying them as exempt employees for 1 month," and decided "to continue paying the H&W knowing that the position would be conformed at the start of the contract" (SOF ¶ 30) (emphasis added).

Appellant has failed to establish entitlement to summary judgment based upon application of FAR 22.1015. Summary judgment in favor of the government is appropriate here, as there is no genuine issue as to any material fact and the government is entitled to judgment as a matter of law.

---

decision in *Ralph Constr., Inc.*, ASBCA No. 35633, 88-2 BCA ¶ 20,731, and the decision of another board in *Richlin Security Services Co.*, DOTCAB No. 3034, 98-1 BCA ¶ 29,651). Presumably, appellant's belief that *Collins* has a "negative history" is based upon the fact that the two board decisions cited by appellant are identified in a Westlaw "history search" of *Collins* as having a "negative treatment." We reject appellant's attempt to cast some type of Scarlet Letter upon the Federal Circuit's decision based upon characterizations found in a Westlaw case history search. Regardless of Westlaw's label, *Collins* remains binding precedent, to which this Board adheres. Moreover, as we have already discussed, appellant's reliance upon our decision in *Ralph Construction* is misplaced.

V.  Appellant Has Failed to Establish Entitlement to Summary Judgment Based
    Upon Application of FAR 52.222-43

Appellant seeks reimbursement of its increased labor costs pursuant to the Price
Adjustment Clause set forth in FAR 52.222-43, Fair Labor Standards Act and Service
Contract Labor Standards-Price Adjustment (Multiple Year and Option Contracts) (app.
mot. at 6).  A "contractor is entitled to a price adjustment to reflect increased labor costs
associated with complying with an increase in the FLSA minimum wage rate, DOL
prevailing wage rate, or the predecessor contract's collective bargaining agreement." *Call
Henry, Inc. v. United States*, 855 F.3d 1348, 1351 (Fed. Cir. 2017).  "The SCA Price
Adjustment Clause mandates contractor compliance with the DOL wage determination in
effect at specific points in a contract's life, such as the anniversary date of a multiple year
contract or the beginning of each option period." *Parsons Gov't Servs.*, 20-1 BCA ¶
37,655 at 182,816.  "For multi-year and option contracts . . . the applicable SCA Price
Adjustment Clause is FAR 52.222-43." *Call Henry*, 855 F.3d at 1351.

FAR 52.222-43(d) provides, in part, that "contract price, contract unit price labor
rates, or fixed hourly labor rates will be adjusted to reflect the Contractor's actual
increase or decrease in applicable wages and fringe benefits to the extent that the increase
is made to comply with or the decrease is voluntarily made by the Contractor as a result
of . . . (2) An increased or decreased wage determination otherwise applied to the contract
by operation of law."  The question we must decide here is whether incorporation of the
wage conformance into Task Order 0713 during the base year entitles appellant to
reimbursement of additional costs incurred during the renewal period based upon that
conformance once the government exercises its option.[16]

FAR 52.222-43 provides for adjustment of contract unit price labor rates to reflect
an increase in actual applicable wages to the extent the increase is made to comply with a
wage determination applicable at the beginning of the renewal option period.
Specifically, FAR 52.222-43(d) requires adjustment to the contract unit price labor rates,
"to reflect the Contractor's actual increase . . . to the extent that the increase is made to
comply with . . . (1) The Department of Labor wage determination applicable . . . at the
beginning of the renewal option period . . . ."  Subpart (d)(1) also provides as an example
the issuance of a new wage determination which causes an increase in certain rates.

However, appellant's argument under this FAR provision is not based upon the
premise that it is entitled to an increase in costs because of the issuance of a new wage
determination at the beginning of the option period.  Rather, appellant argues that
because the current wage determination in the base year of Task Order 0713 now

---

[16] We note that the record contains no documents indicating whether the government
       exercised its option to renew Task Order 0713 subsequent to its base period of
       performance from September 30, 2020, through July 30, 2021 (SOF ¶ 19).

28

includes the conformance it requested, appellant is entitled to reimbursement for costs incurred during the option period based upon the base-year conformance (app. mot. at 4- 5). The government responds that "if appellant is not entitled to a price adjustment for the base year, as the government has demonstrated, there is no basis for entitlement to a wage adjustment until a renewal option period in which the applicable wage rates increase" (gov't cross-mot. at 15 n.4).

FAR 52.222-43 sets forth the way in which option contracts may be adjusted at the beginning of each option period, based upon the DOL wage determination in effect at the beginning of that option period (such as the issuance of a new or revised wage determination). As stated by the government, only when DOL "issues a wage determination revision that raises the minimum wages under the conformance for the Program Educators," will the contracting officer be required to "adjust the contract price in accordance with FAR 52.222-43(d)(1)" (gov't cross-motion at 15-16 n.4). "[S]uch an increase would only reflect the difference between the new conformed rates at the renewal option period and the DoL conformance rates of October 29, 2020; it would not reflect the difference between the new wage rates at the renewal option period and appellant's proposal since appellant is not entitled to an adjustment for that conformance" (gov't cross-motion at 16 n.4.). We agree. FAR 52.222-43 has no application to adjustments requested during the base period of the contract, and likewise provides no basis for a price adjustment during a renewal period, based upon a conformance issued during the base period.

Appellant argues that:

> [w]hile subparagraph (d)(1) of the clause addresses price adjustments for compliance with a 'wage determination applicable on the anniversary date of the multiple year contract, or at the beginning of the renewal option period,' it does not follow that this subparagraph bars recovery under the circumstances at issue – when, but for the Army's actions, a conformed wage determination would have been incorporated into the Contract at award.

(app. mot. at 5) (emphasis omitted). The government responds, stating "the Army's actions were not the reason the conformed labor categories were not included in the contract. The Department of Labor determined that the Program Educators were not subject to the SCA" (gov't cross-mot. at 9). The government here is correct. As we already have found, the Army relied upon information conveyed to it by DOL, pursuant to the authority granted by the SCA to DOL (and not to the contracting agency) to clarify labor employee classifications (SOF ¶¶ 12, 14); *Collins*, 744 F.2d at 815; *Sterling Servs., Inc.*, 91-2 BCA ¶ 23,714 at 118,699.

Appellant argues also that DOL's conformance of the Program Educators classification comes within the "by operation of law" provision set forth in FAR 52.222-43(d)(2) (app. mot. at 6). As support for its argument, appellant cites the Federal Circuit's dicta in *Schleicher*, stating that "the Federal Circuit recognizes that any limitation in FAR 52.222-43 do[es] not bar the recovery provided for by FAR 22.1015" (app. mot. at 7), and "[w]hether it is directly precedential, [*Schleicher*] certainly stands for the proposition that Government errors entitle contractors to equitable adjustments when such errors cause a cost increase" (app. reply at 20).

The government responds, stating that "the plain language of *Schleicher* indicates that a contracting officer *may* equitably adjust the contract, which in no way suggests that equitable adjustment is required," that "*Schleicher* involved the 'belated incorporation of a wage determination,' whereas here, appellant argues only that the Army allegedly failed to incorporate a conformance to the wage determinations that were already incorporated into the Contract," and that "a conformance does not equal 'an applicable wage determination' within the meaning of FAR 22.1015" (gov't cross-mot. at 10) (emphasis in original). As we already have found, *Schleicher* involved facts substantively different than those presented here and appellant's reliance upon dicta in that decision is misplaced.

Appellant cites no decision holding that the issuance of a conformance equates to a "an increased or decreased wage determination otherwise applied to the contract by *operation of law*," as that term is utilized in FAR 52.222-43(d)(2) (emphasis added). In contrast, the government cites our decision in *Sterling Services, Inc.*, 91-2 BCA ¶ 23,714 at 118,698, where we rejected a similar contractor claim for an equitable adjustment based upon the conformance of a position (gov't cross-mot. at 13). As noted by the government, the contract in *Sterling Services* "included a clause with virtually identical language to FAR 52.222-43(d), including the provisions for wage adjustments on the anniversary date or option renewal, by operation of law, and by amendment of the Fair Labor Standards Act" (*id.*).[17] In that appeal, we held that, regarding the base period, the contractor "cannot prevail since the burden of inaccurate or missing wage rate classifications is placed on it, not the Government, by the contract, the Service Contract Act and the case law." 91-2 BCA ¶ 23,714 at 118,698. Regarding the option period, we found that the contractor was entitled to an adjustment based upon a DOL wage determination issued during the option period that was made retroactive to the beginning of the option period, holding that such an "adjustment is warranted where the Department

---

[17] The government correctly notes that decisions addressing FAR 52.222-43(d)(2) in the context of the term "by operation of law," often "concern the so-called Successor Rule, whereby collective bargaining agreements entered into by incumbents are made binding on subsequent awardees 'by operation of law'" (gov't reply at 14 n.5) (citing *Call Henry,* 855 F.3d at 1352-55; *Parsons Gov't Servs.*, 20-1 BCA ¶ 37,655 at 182,816).

30

of Labor makes a determination of the minimum prevailing wages 'applicable at the beginning of the renewal option period.'"  91-2 BCA ¶ 23,714 at 118,699.  As we already have found, that is not the situation presented here.

DysTech sites the Court of Federal Claims decision in *Lockheed Support Sys., Inc. v. United States*, 36 Fed. Cl. 424, 429 (1996), for the proposition that the FAR does "not provide contractors the exclusive basis for recovering increased costs resulting from revised wage determinations as 'wage revisions made outside the Price Adjustment Clause are not prohibited'" (app. mot. at 8).[18]  However, this Board in *Sonoran Technology and Professional Services, LLC*, ASBCA No. 61040, 17-1 BCA ¶ 36,792 at 179,332-333, rejected a similar argument, holding instead that "[t]he Changes clause does not explain how to compute an equitable adjustment," rather "[t]he SCA Price Adjustment clause [FAR  52.222-43] does so, for labor rate adjustments required by an SCA wage determinations."  We stated also that, even assuming "the Changes clause entitled a contractor to an equitable adjustment for a revised wage determination, the calculation of that adjustment would be governed by the SCA Price Adjustment clause." *Id*. at 179,333.[19]  As we already have held, DysTech is not entitled to additional monies based upon FAR 52.222-43.

Summary judgment on this issue in favor of the government is appropriate here, as there is no genuine issue as to any material fact and the government is entitled to judgment as a matter of law.

### VI.  DysTech's Has Failed to Establish Entitlement to Summary Judgment Based Equitable Estoppel/ Misrepresentation/ Detrimental Reliance

### A.  Equitable Estoppel

---

[18] We note that decisions of the Court of Federal Claims are not "binding upon this tribunal, nor are they even binding in other matters pending before the Court of Federal Claims." *Northrop Grumman Corp*., ASBCA No. 62165, 21-1 BCA ¶ 37,922 at 184,176 n.8 (citing *C.R. Pittman Constr. Co., Inc*., ASBCA No. 57387 *et al.*, 15-1 BCA ¶ 35,881 at 175,427 n.6) (Court of Federal Claims decisions are not binding precedent for the ASBCA); *Zaccari v. United States*, 142 Fed. Cl. 456, 462 n.6 (2019) ("Decisions of the United States Court of Federal Claims do not bind the court in this matter but may provide persuasive authority").

[19] The government also notes that the changes clause contained in *Lockheed Support* provided that "[a]ny other written or oral order . . . from the contracting officer that causes a change will be treated as a change order under this clause," while the clause included in Task Order 0713 (FAR 52.243-1, Changes – Fixed Price (Aug 1987), "provides for changes to: '(1) drawings, designs, or specifications . . . (2) method of shipment . . . and (3) place of delivery'" (gov't cross-mot. at 16-17) (alterations in original).

Both parties agree that to establish equitable estoppel the party asserting the claim must demonstrate: "(1) misleading conduct, which may include not only statements and actions but silence and inaction, leading another to reasonably infer that rights will not be asserted against it; (2) reliance upon this conduct; and (3) due to this reliance, material prejudice if the delayed assertion of such rights is permitted" (app. mot. at 11; gov't cross-mot. at 17 (citing *Mabus v. General Dynamics C4 Systems, Inc.*, 633 F.3d 1356, 1359 (Fed. Cir. 2011))). However, what the parties fail to note is that "the Government may not be estopped on the same terms as any other litigant," *Heckler v. Cmty. Health Servs.*, 467 U.S. 51, 60 (1984), and "that if equitable estoppel is available at all against the government some form of affirmative misconduct must be shown in addition to the traditional requirements of estoppel." *United Pacifc Ins. Co. v. Roche*, 401 F.3d 1362, 1366 (Fed. Cir. 2005) (quoting *Zacharin v. United States*, 213 F.3d 1366, 1371 (Fed. Cir. 2000)) ("While the Supreme Court has not squarely held that affirmative misconduct is a prerequisite for invoking equitable estoppel against the government, this court has done so").

Appellant has failed to allege facts demonstrating misleading conduct or reliance necessary to establish estoppel. The Army's actions - informing appellant that the Army had requested an updated conformed Wage Determination from DOL and that DOL had replied stating that the labor categories listed on the conformed copy of the previous task order (Task Order 2TO2) would not be subject to the SCA - was in no way misleading (SOF ¶¶ 12, 14). Rather, the Army simply conveyed information it received from DOL. Indeed, the record here establishes that appellant expressly disagreed with the Army's statement and what DysTech believed was incorrect information. Given appellant's stated belief that the labor category of Program Educator should be conformed, that it was prepared to seek that conformance after award, and was certain as to the outcome of its request (SOF ¶¶ 16-18, 30), appellant cannot establish material prejudice here. *Symetrics Industries, LLC*, ASBCA No. 58001, 15-1 BCA ¶ 35,997 at 175,859 (estoppel is not appropriate where the advancing party "clearly possessed knowledge" of the alleged misleading information).

In its reply brief, appellant argues "it is undeniable that DoL made an error by instructing that the Program Educator position was not subject to the SCA," and that the Army "doubled down on this mistake by accepting it" (app. reply at 23). However, DysTech does not allege, nor can it establish under the facts of this appeal, that actions by the Army (or DOL) constituted affirmative misconduct. The "requirement of affirmative misconduct contemplates government misconduct 'of a nature more compelling than the conduct that would otherwise apply against a private party.'" *Raytheon Co.*, ASBCA No. 57576 *et al*, 15-1 BCA ¶ 36,043 at 176,055-56 (quoting *Northrop Grumman*, ASBCA No. 57625, 14-1 BCA ¶ 35,501 at 174,024); *see also RGW Communications*, ASBCA Nos. 54557, 54495, 05-1 BCA ¶ 32,972 at 163,336 (referencing deliberate lies; a pattern of false promises; or intentional deception as examples of affirmative misconduct). The Army's actions here certainly did not constitute affirmative

misconduct, as that term is discussed above. *ECC International, LLC*, ASBCA No. 58875, 20-1 BCA ¶ 37,683 at 182,965. Accordingly, DysTech cannot "avail itself of the estoppel defense" here. *Kamaludin Slyman CSC*, ASBCA No. 62006, 21-1 BCA ¶ 37,849 at 183,794.

B. Misrepresentation/Detrimental Reliance

DysTech argues that "the Army made an erroneous representation by informing DysTech the 'labor categories listed on the conformed copy of the old task would not be subject to the Service Contract Act'" (app. mot. at 14). As support, appellant cites *King Aerospace, Inc*., ASBCA No. 57057, 16-1 BCA ¶ 36,451 at 177,649, for the proposition that a contractor is entitled to an equitable adjustment "when 'the government made an erroneous representation of a material fact that the contractor honestly and reasonably relied on to the contractor's detriment'" (*id.*). The government responds, stating that the alleged "representation was not erroneous at all, but based on the determination of the DoL, which is the sole and proper authority for determining wage classifications," and that "[t]he Army did not misrepresent any fact; rather, it merely relayed the DoL's determination to appellant" (gov't cross-mot. at 25).[20]

"To prevail on a claim of misrepresentation, appellant must prove both: (1) an erroneous representation of material fact by the government; and (2) reasonable reliance by the contractor." *Diversified Constr. Of Oklahoma*, ASBCA No. 59527, 16-1 BCA ¶ 36,188 at 176,566 (citing *Robertson & Penn, Inc.,* ASBCA No. 55622, 08-2 BCA ¶ 33,921 at 167,859.[21] Appellant has failed to allege facts necessary to establish misrepresentation by the government or reliance by appellant. The Army here did not make an "erroneous representation" to appellant regarding its restatement of information

---

[20] Appellant did not raise misrepresentation as a basis for its claim as submitted to the contracting officer (SOF ¶ 35), nor was misrepresentation alleged in its complaint. DysTech argues (without citing any supporting authority) that "[t]he doctrine of misrepresentation is frequently encompassed by (or overlaps with) the doctrines of equitable estoppel and detrimental reliance)" (app. mot. at 9 n.7). Appellant states that "[t]o the extent the Board disagrees, appellant is certainly willing to modify the Complaint to add a separate Count for misrepresentation" (*id.*).

[21] The government notes also that "the representation did not involve a material fact, but instead involved a conclusion of law" (gov't cross-mot. at 25). Indeed, *King Aerospace*, cited by DysTech, requires that the misrepresentation concern "an erroneous representation of a material fact . . . ." 16-1 BCA ¶ 36,451 at 177,649 (citing *T. Brown Constructors, Inc. v. Pena*, 132 F.3d 724, 728-29 (Fed. Cir. 1997) (contract documents contained erroneous representation of material fact). Given our finding that the government did not misrepresent the information it received from DOL, we do not reach the issue of whether a mistaken conclusion of law is a proper basis upon which to base a claim of misrepresentation.

33

it received from DOL, rather, the Army accurately conveyed that information. Indeed, subsequent to receipt of this information from the Army, DysTech questioned the validity of the information DOL had provided the Army (SOF ¶¶ 17-18), stating its belief that DOL ultimately would issue a conformance and classify Program Educators as subject to the SCA (SOF ¶ 30) ("While our bid proposed them [sic] employees as exempt, so no H&W was bid, we decided to continue paying the H&W knowing that the position would be conformed at the start of the contract [Task Order 0713]"). By stating its direct disagreement with the Army's statements, appellant cannot establish that it was misled or reasonably relied upon the statement *See DG,* [21] *LLC*, ASBCA No. 56386, 12-1 BCA ¶ 34,898 at 171,605 (incumbent contractor with knowledge that historical information was available failed to demonstrate it was misled by, and honestly and reasonably relied upon, government's representation as to the lack of available historical information); *Huff & Huff Service Corp.*, ASBCA No. 36039, 91-1 BCA ¶ 23,584 at 118,256 (contractor not misled regarding "likely magnitude of passenger vandalism damage costs since it contemporaneously knew of the nature and extent of the passenger vandalism damages experienced by the prior bus shuttle service contractor").

Appellant blames the contracting officer for alleged "conflicting guidance" provided by DOL (app. reply at 11). Specifically, appellant references the statements made by DOL to the contracting officer that "services called for under this procurement appear to be performed exclusively, or nearly so, by professional employees," that "[b]ona fide professional employees are not service employees, and this procurement would not be subject to the Service Contract Act" (SOF ¶ 12), as compared to the statement Ms. Torres made to appellant "that even though this is a recompetition, the conformed labor category that was created would still be applicable for this requirement, and once a contract is converted to SCA it cannot be pulled out of that requirement unless material changes were made to scope, which in this case they were not." (SOF ¶ 15).

According to appellant, it was "unreasonable for the Contracting Officer to definitively conclude that the SCA did not apply to the Program Educator program" (app. reply at 11). Appellant likewise argues that the contracting officer is "responsible for obtaining additional guidance when questions or confusion persists" (app. reply at 12 (citing FAR 22.1008-1 OBTAINING WAGE DETERMINATIONS)). FAR 22.1008-1 sets forth the steps a contracting officer must take in obtaining wage determinations.

It is undisputed that the contracting officer here obtained prevailing wage determinations and incorporated them into Task Order 0713 (SOF ¶ 20). As for the contracting officer's alleged obligation to obtain "additional guidance when questions or confusion persists," in actuality, FAR 22.1008-1(f), provides "if the contracting officer has questions regarding the procedures for obtaining a wage determination, or questions regarding the selection of a wage determination, the contracting officer should request assistance from the agency labor advisor." Here, the contracting officer did exactly that – he inquired from DOL and was informed that "services called for under this procurement

appear to be performed exclusively, or nearly so, by professional employees," and that "[b]ona fide professional employees are not service employees, and this procurement would not be subject to the Service Contract Act" (SOF ¶ 12).

Regarding appellant's reference to or reliance upon statements made by Ms. Torres, appellant's argument ignores the fact that the RFP placed upon DysTech the responsibility to identify SCA-covered employees and seek conformance of unlisted positions (SOF ¶ 7). The Commonly Asked Questions attachment to the RFP, in response to the question, "[w]hat Service Contract Act applicable Labor Categories and Wage Determinations should be used for the proposal?" provided, in part, that "[l]abor categories covered by the SCA will be subject to the requirements of the prevailing wage determination base labor rates for the actual place(s) of performance," and that "SCA Wage Determinations are available at https://beta.sam.gov/" (SOF ¶ 7). Appellant was provided the information it needed to properly price the Task Order work. However, DysTech did not adjust its proposed labor costs pre-award for the Program Educator position at Fort Hood, ignoring relevant knowledge it held about that position as the incumbent contractor at one of the two installations, and instead, noted in its proposal that it would request an equitable adjustment to the fixed price contract in the event a conformance was granted for that position (SOF ¶ 16-18). By failing to increase its proposed labor rates for Program Educator, appellant submitted a lower fixed-price offer, hedging its bet that it would be entitled to an equitable adjustment for any increase in labor rates after award resulting from DOL conformance of that position.

In its sur-reply, appellant faults the contracting officer for relying upon the "guidance given directly to him" by DOL, rather than conflicting guidance provided to DysTech by another DOL employee, whom appellant suggests "*likely* had the most complete set of information" (app. sur-reply at 4) (emphasis added). Again, to the extent appellant believed there existed conflicting information from DOL, it was incumbent upon appellant to decide how best to utilize that information in submitting its offer, as the RFP squarely put the obligation upon offerors to determine proposed labor categories and identify any that are non-exempt and are covered by the SCA (SOF ¶ 7). Appellant also suggests that the contracting officer "failed to reach out to Ms. Torres in a timely fashion" (app. sur-reply at 4). To the extent appellant believes the contracting officer did not act in a timely matter, we note that it was appellant that missed the deadline for submitting such questions to the government under the timeline set forth in the RFP (SOF ¶¶ 9-11).

Summary judgment in favor of the government is appropriate here, as there is no genuine issue as to any material fact and the government is entitled to judgment as a matter of law.

VII. DysTech Has Failed to Establish Entitlement to Summary Judgment Based Upon Mutual Mistake

35

Appellant argues that "the parties were mutually mistaken in their position that the Program Educator was not subject to the SCA" (app. mot. at 12). To establish a mutual mistake of fact, DysTech must demonstrate:

> (1) the parties to the contract were mistaken in their belief regarding a fact;
>
> (2) that mistaken belief constituted a basic assumption underlying the contract;
>
> (3) the mistake had a material effect on the bargain; and
>
> (4) the contract did not put the risk of the mistake on the party seeking reformation.

*CleanServ Executive Services, Inc.*, ASBCA 47781, 96-1 BCA ¶ 28,027 at 139,922 (citing *Dairyland Power Cooperative v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (additional citation omitted). DysTech simply cannot establish that it was mistaken here.

"To establish a mutual mistake of fact . . . the party seeking reformation must show that the parties to the contract held an erroneous belief as to an existing fact." *Dairyland Power Co-op. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (emphasis omitted); *see Memory Link Corp. v. Motorola Solutions, Inc., Motorola Mobility, Inc.*, 773 F.3d 1266, 1272 (Fed. Cir. 2014) (party not mistaken as to fact, precluding "any basis for finding a mutual mistake"). Appellant alleges that it "relied on the Army's directive, believing the SCA was indeed not applicable to the Program Educator," and that "DysTech was operating under this mistaken assumption at the time of entering the Contract [and] it submitted a proposal with an SCA-exempt Program Educator" (app. mot. at 12).

Appellant's suggestion that it was mistaken that the Program Educator position was not subject to the SCA is belied by the fact that appellant is on record stating pre-award that (1) it did not believe Program Educators were exempt under the SCA based upon knowledge it held as an incumbent on the previous Fort Hood procurement (Task Order 2TO2), and (2) it intended to submit a conformance, which it believed would be granted, and ultimately it would request for equitable adjustment based upon DOL's granting the conformance (SOF ¶ 17-18). In addition, as admitted by appellant post-award, although its "bid proposed [Program Educators] as exempt, so no H&W was bid, we decided to continue paying the H&W knowing that the position would be conformed at the start of the contract" (SOF ¶ 30).

36

Appellant cites *Burnside-Ott Naval Aviation Training Ctr. v. United States*, 985 F.2d 1574 (Fed. Cir. 1993), for the proposition that the doctrine of "mutual mistake may entitle a contractor to additional compensation when the contractor has to reclassify employees to higher paid classifications" (app. mot. at 8-9). Appellant's reliance upon *Burnside* is misplaced as the Federal Circuit there reversed the Court of Federal Claims' grant of summary judgment for the government based upon the lower court's finding that the SCA placed the risk of increased labor costs on the contractor. 985 F.2d at 1581-83. In this appeal, however, DysTech's assumption of the risk is based, not upon the terms of the SCA, but upon the specific requirement contained in Task Order 0713 that the contractor propose and identify any labor categories that were subject to the SCA and pay the SCA prevailing wage rate to any labor categories identified as being non-exempt (SOF ¶ 7). Here, Task Order 0713, clearly "put the risk of the mistake on the party seeking reformation." *CleanServ*, 96-1 BCA ¶ 28,027 at 139,922.

We note that mutual mistake typically applies to mistakes of fact, not mistakes of law. *Bank of Guam v. United States*, 578 F.3d 1318, 1330 (Fed. Cir. 2009); *Mills v. United States*, 187 Ct. Cl. 696, 700, 410 F.2d 1255, 1257 (1969) ("absence of unusual circumstances, representations as to questions of law form no basis for setting aside a contract"). The dispute here presents an issue of law. *Parsons Gov't Servs.*, 20-1 BCA ¶ 37,655 at 182,817 ("A contention that the parties mistakenly interpreted the requirements of Wage Order No. 4 is not a mutual mistake of fact but a mistake of law. A mistake of law is not a ground for reformation"). In its sur-reply, appellant argues, without providing any legal citation, that the mistake here was one in fact, "because DoL failed to properly consider the nature and scope of work of the Program Educator position, as well as the fact that a predecessor contract did contain a very similar position" (app. sur-reply at 10). In other words, according to appellant, DOL came to the wrong legal conclusion based upon facts presented to it. Notwithstanding appellant's contrary suggestion, the issue, as framed by DysTech, reveals an alleged mistake in law, not fact.

We find that appellant has failed to allege facts demonstrating that the parties here were mutually mistaken or that the Task Order did not place the risk of mistake on appellant. There was no mutual mistake as appellant was not mistaken - it disagreed with the government's position yet decided to submit its proposal in the manner that it did, regardless of that disagreement. There exists no genuine issue of material fact on this issue. The government is entitled to summary judgment as a matter of law.

VIII. The Government is Entitled to Summary Judgment on Its Affirmative Defense of Assumption of the Risk

In support of its cross-motion for summary judgment, the government argues that DysTech is barred from recovery because it "assumed the risk of the employee misclassification," because "[d]espite knowing that the Program Educators had been conformed on the predecessor Contract and that the Solicitation and Contract directed

37

appellant to identify SCA-covered employees and seek conformance of unlisted labor categories, appellant still chose to propose those positions at a rate lower than the conformed rate" (gov't cross-mot. at 27).[22]  Quoting our decision in *DK's Precision Machining & Mfg*, ASBCA No. 39616, 90-2 BCA ¶ 22,830 at 114,640, the government states that "[i]t is well established that a contractor in a fixed price contract assumes the risk of unexpected costs in the absence of a clause shifting such risk to the Government" (gov't cross-mot. at 27-28).  We agree.

The situation here is analogous to an offeror who has knowledge of what it believes to be an error in the solicitation yet fails to raise the issue through one of the protest avenues available to that offeror.  *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007) (by failing to lodge protest pre award, party waived right to challenge terms of solicitation regarding applicability of SCA).  In *Bannum, Inc. v. United States*, the Federal Circuit held, in the context of a bid protest, that the "mere notice of dissatisfaction or objection is insufficient to preserve [a] defective-solicitation challenge" where "[t]he solicitations at issue and the governing regulations put [the offeror] on notice of the formal requirements for filing a 'protest' that would trigger an agency obligation of response and prompt resolution."  779 F.3d 1376, 1380 (Fed. Cir. 2015).  In that appeal, because the offeror "did not comply with those requirements; nor did it pursue other available means of formal protest" until after award, the court found that the offeror "waived its solicitation challenges."  *Id*.

In *Robins Maintenance, Inc. v. United States*, 265 F.3d 1254, 1258 (Fed. Cir. 2001), the Federal Circuit held that an incumbent contractor on a grounds maintenance contract was not entitled to an equitable adjustment based upon alleged defective specifications "because it made an affirmative decision to bid on a specification, which it knew to be inaccurate."  In that appeal, the contractor's president informed the contracting officer about acreage errors contained in a technical exhibit, to which the contracting officer "responded by telling him to bid on the erroneous solicitation."  *Id*.  The Federal Circuit noted that "[t]his is not a situation in which the contractor identified a possible error in the contract, and the government led the contractor to believe that there was no error," noting that "[t]here is no claim that even

---

[22] In its sur-reply, appellant characterizes the government's argument as painting "an unrealistic and frankly strange portrait of contractors running amok underpricing labor categories and then demanding equitable adjustments" (app. sur-reply at 7).  Although the government's briefs contain no allegations of contractors actually "running amok," we agree that, in this appeal, DysTech's approach resulted in it submitting a lower cost proposal for Program Educators at Fort Hood than the wage determination rate specified for Technical Instructors at that location (SOF ¶¶ 28, 30), and that appellant then submitted after award a request for equitable adjustment for increased costs based upon the rate for Technical Instructors at Fort Hood.

after this exchange between the government and the contractor, the contractor thought that the acreage estimates were anything but an error." *Id.* So too here: DysTech believed that the contracting officer, and the information he received from DOL, was incorrect. *Johnson Controls, Inc. v. United States*, 229 Ct. Cl. 445, 460, 671 F.2d 1312, 1320 (1982) ("If a contractor enters into a contract aware of the fact of defective specifications, it is not entitled to recover on a claim based on these defective specifications" (quoting *Wickham Contracting Co. v. United States*, 212 Ct. Cl. 318, 328, 546 F.2d 395, 400 (1976) (contractor not entitled to recover where "[b]oth sides had equal knowledge of the error")); *Assist Consultants, Inc.*, ASBCA No. 61525, 21-1 BCA ¶ 37,850 at 183,807 ("The Federal Circuit has more generally held that this waiver principle 'applies to all situations in which the protesting party had the opportunity to challenge a solicitation before the award and failed to do so'") (citations omitted).

By submitting a proposal based upon information it considered to be erroneous, and by failing to take avenues available to it to challenge the solicitation language prior to submitting its proposal, DysTech assumed the risk and is not entitled now to recover on its claim for additional costs. We reject DysTech's attempt to have its cake and eat it too by submitting a lower price cost proposal (thereby gaining a competitive advantage), yet stating in its cost and technical proposals its intent after award to submit a request for equitable adjustment in the event DOL issued a conformance of the Program Educators classification. On the issue of assumption of the risk, there is no issue of material fact and the government is entitled to summary judgment as a matter of law.

CONCLUSION

Appellant's motion for summary judgment is denied. The government's cross-motion for summary judgment is granted and the appeal is denied.

Dated: January 26, 2023

(Signatures continued)

DAVID B. STINSON
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 63037, Appeal of Dynamic Systems Technology, Inc., rendered in conformance with the Board's Charter.

Dated:  January 27, 2023

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals